In re Donald L. ZURFACE, Sr.,
Mildred L. Zurface, Debtors.

In re Donald L. ZURFACE, Jr.,
Marguerite Zurface, Debtors.

Bankruptcy Nos. 2–87–05799,
2–87–05800.

United States Bankruptcy Court,
S.D. Ohio, E.D.

Jan. 11, 1989.

**528**

Charles W. Ewing, Charles W. Ewing Co., L.P.A., Columbus, Ohio, for debtors.

William B. Logan, Jr., Luper, Wolinetz, Sheriff & Neidenthal, Columbus, Ohio, for Farm Credit Bank of Louisville.

Frank M. Pees, Worthington, Ohio, Chapter 12 trustee.

Michelle Sutter, Baker & Hostetler, Columbus, Ohio, for Chapter 12 trustee.

Charles M. Caldwell, Office of the U.S. Trustee, Columbus, Ohio, Asst. U.S. Trustee.

## OPINION AND ORDER

R. GUY COLE, Jr., Bankruptcy Judge.

This matter is before the Court following a hearing to consider confirmation of the plans proposed under Chapter 12 of the Bankruptcy Code by debtors Donald L. Zurface, Sr., Mildred L. Zurface, Donald L. Zurface, Jr. and Marguerite Zurface. Confirmation of the plans was opposed by The Farm Credit Bank of Louisville and Frank M. Pees, the Chapter 12 trustee, in hearings held on August 17–19, and September 1 and 9, 1988. The matter was deemed submitted for decision upon the filing of post-hearing briefs on December 5, 1988.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered in this judicial district. This is a core proceeding which this Court may hear and determine. 28 U.S.C. § 157(b)(1) and (b)(2)(L). The following opinion and order shall constitute the Court's findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052.

### Preliminary Statement

Following the hearing on confirmation the parties submitted proposed findings of fact. The proposed findings submitted by The Farm Credit Bank of Louisville, formerly known as Federal Land Bank ("FLB"), and by Frank M. Pees, the Chapter 12 trustee ("Pees"), are comprehensive. The findings proposed by the debtors are incredibly sparse, containing only six specific references to a transcript whose length exceeds 1,000 pages. FLB and Pees have attempted, in their findings, to set out a detailed account of the tangled web of transactions woven by these debtors. However, the lack of any legitimate business purpose for many of the transactions described herein, compounded by the paucity of meaningful documentation, makes it difficult to set forth facts which adequately explain the motives and reasons for the various transactions about which FLB and Pees complain.

### Findings of Fact

1. The debtors in these two related cases are Donald L. Zurface, Sr. and his wife, Mildred L. Zurface, and their son, Donald L. Zurface, Jr. and his wife, Marguerite (collectively referred to as "Debtors" or "the Zurfaces").

2. By stipulation of the parties, the testimony of Donald Zurface, Jr. binds each of the Debtors in the two bankruptcy cases. Donald Zurface, Sr. did not testify due to serious medical problems. Likewise, neither Mildred nor Marguerite Zurface was called as a witness in this contested matter.

3. Debtors' bankruptcy cases were commenced by the filing on December 31, 1987, of voluntary petitions under Chapter 12 of the United States Bankruptcy Code ("Code").

4. The Debtors once operated a farming operation in Fayette County, Ohio (Transcript [hereinafter "Tr."] 33 and FLB Ex. 34). Debtors never treated their farming operation as a partnership for tax purposes (FLB Exs. 14, 25, 40, 41, 43 & 44); instead, they treated it as an informal partnership (Tr. 33), starting in approximately 1976 through the date of filing of their respective Chapter 12 petitions.

5. Donald Zurface, Jr. was awarded a bachelor's degree in Agriculture in 1975 from the Ohio State University and commenced working on the family farm immediately thereafter (Tr. 32, 701).

6. In order to refinance existing obligations to FLB and Production Credit Association ("PCA"), Debtors executed a promissory note ("Note") on or about April 26, 1982, made payable to FLB in the principal amount of $675,000. The Note required annual payments in the amount of $87,372.61, commencing on April 1, 1983, and continuing until April 1, 2017 (FLB Ex. 33). FLB and Debtors jointly executed a document captioned "Change of Installment Maturity Dates," changing all installment maturity dates from April 1 to December 1 (FLB Ex. 58; Tr. 385). In order to secure payments under the Note, Debtors granted FLB a first mortgage interest in all of their real property (FLB Ex. 34). Debtors were unable to make the payment due on December 1, 1984, until July 16, 1985. The payment due on December 1, 1985, has never been made. The July 16, 1985, payment is the last payment made by the Debtors to FLB (Tr. 190–91, 387). Farmers Home Administration ("FmHA") refinanced Debtors' note with PCA on February 2, 1984, thereby eliminating PCA as a creditor of these Debtors.

7. In December, 1985, and early 1986, the Debtors and FLB representatives attempted to restructure the Note and its accompanying obligations (Tr. 387–398). Debtors and FLB explored several alternatives, including complete and partial liquidation of the farming operation. A liquidation of the farming operation may have posed unfavorable tax consequences for the Debtors (Tr. 282, 611).

8. On December 10, 1985, Donald Zurface, Sr. and Donald Zurface, Jr. executed and delivered to FLB a balance sheet dated December 10, 1985, disclosing the assets and liabilities of their combined farming operation (FLB Ex. 16). The balance sheet valued machinery, equipment, and trucks (collectively, the "Equipment") at $130,000. However, the Equipment was worth only $49,502 in December, 1985 (FLB Ex. 28; FLB Compilation No. 1; Tr. 49, 53, 54, 63, 64). The balance sheet valued breeding sows, boars and feeder hogs ("Livestock") at $48,110. Crops were valued between $102,910 and $111,550. The balance sheet valued Debtors' real property, consisting of approximately 555 acres, at $850,000; however, Donald Zurface, Jr. conceded that $695,000 was a more accurate appraisal for the Debtors' real property in December, 1985 (Tr. 54, 55).

9. On April 7, 1986, the Debtors formed an Ohio corporation known as Hillary–Dawn, Inc. ("H–D") (FLB Ex. 1, Tr. 36). The sole shareholder of H–D was, and still is, "Sharon Rood–Trustee" (Tr. 42, 43; FLB Ex. 2). Sharon Rood ("Rood"), as trustee, holds all 50 of the outstanding shares of H–D. H–D's capitalization of $500 was provided by Donald Zurface, Sr. and Donald Zurface, Jr. This capitalization has never been increased (Tr. 37, FLB Ex. 1). H–D paid back the $500 to Donald Zurface, Sr. and Donald Zurface, Jr. after the corporation was formed (Tr. 774).

10. Rood is Marguerite Zurface's sister (Tr. 36). In April 1986, Rood was appointed by Donald Zurface, Jr. and his wife as trustee under a trust arrangement for the benefit of the Zurfaces' only child, Hillary Dawn. A second child, Amanda Zurface, has been born since that time. Rood has continued to serve as trustee, at least nominally, for the Zurfaces' two children under the aforementioned trust arrangement (Tr. 43, 44).

11. Rood has performed no discernible functions as trustee since her appointment. Rood understood that her duty as trustee was primarily to assure the well-being of Donald and Marguerite's children in the event of the parents' disability or death (Tr. 296, 718). Although Donald Zurface, Jr. initially testified that he and his wife executed a written trust agreement appointing Rood as trustee, no written agreement of trust or any copy thereof has been located and he now doubts that one was ever executed (Tr. 45, 56, 717).

12. FLB Exhibit 24, a typed but unsigned trust agreement, was prepared at Debtors' direction subsequent to the filing of their Chapter 12 cases. According to Donald Zurface, Jr., this unexecuted trust agreement was intended to serve as a replacement to the missing April 1986 agreement and incorporates its terms (Tr. 47–49).

Donald Zurface, Jr. now believes that because the initial trust agreement was probably never reduced to writing, the trust might have been an oral trust (Tr. 814–815). The Court finds that there was no written trust agreement executed by Debtors in April, 1986, or at any other time.

13. According to Donald Zurface, Jr., the typed, but unexecuted trust agreement —FLB Exhibit 24—contains one paragraph which he did not intend to include in the April, 1986, trust agreement, had it been reduced to writing. That paragraph, Article Two, Paragraph A.1., provides as follows:

> During the lifetime of Grantors the Trustee shall distribute to or for the benefit of either Grantor, so much of the net income and, if the income is insufficient therefor, of the principal of the share held for the benefit of Grantors, as the Trustee, in her sole discretion deems necessary or proper to provide for either Grantors' maintenance, support, health, comfort and education (including college, graduate or professional school, or any other type of education), to travel, to purchase transportation, to purchase life or health insurance on the life of either Grantors or for such other similar specific purposes or general needs until both shall die.

14. H–D's Board of Directors is composed of Donald Zurface, Sr., Donald Zurface, Jr. and Marguerite Zurface (Tr. 38) and has remained unchanged since its formation. H–D's officers also have remained the same. They are Rood, President; Marguerite Zurface, Secretary; and Donald Zurface, Jr., Treasurer (Tr. 38, 39).

15. Rood had never been personally involved in a farming operation prior to her association with H–D (Tr. 292, 769–771). Rood never managed a business (Tr. 331). She exhibited virtually no knowledge of, nor exercised any control over, any of H–D's affairs (Tr. 300, 319–321). Rood did not possess or maintain the corporate books or records. Rood never signed a corporate tax return and was unaware that she had authority to sign corporate checks.

16. On April 8, 1986, the Debtors and H–D executed a series of documents, including two purchase agreements (FLB Exs. 3, 12 & 13; Tr. 59, 60, 66–68), which resulted in the transfer of the following assets from the Zurfaces to H–D:

A. All Equipment of the Zurfaces for the purchase price of $36,930 (FLB Ex. 12; Tr. 49, 50, 53, 67) (the "Equipment Purchase"); and

B. All of the Debtors' Livestock for the purchase price of $24,561 (FLB Ex. 13; Tr. 50, 51, 67, 68) (the "Livestock Purchase").

17. As a result of the conveyance of the Equipment and Livestock, Debtors own no personalty, i.e., equipment, machinery or livestock, with which to conduct a farming operation.

18. H–D executed a series of notes evidencing obligations owed by H–D to Donald Zurface, Sr. and Donald Zurface, Jr. arising out of the transfer of the Equipment and Livestock. Rood, on behalf of H–D, executed two sets of notes evidencing the same obligations, one group hand-written (FLB Exs. 4, 6, 8 & 10 and Tr. 86, 87) and the other group type-written (FLB Exs. 5, 7, 9 & 11; Tr. 86, 87). The hand-written notes were executed in April, 1986. These notes were in the possession of Donald Zurface, Jr., either individually or in his capacity as an officer of H–D, at all times (Tr. 89). The type-written notes were not executed until an unspecified later date (Tr. 140). The type-written notes were executed because Debtors believed that they provided a more formal record of the transactions (Tr. 92).

19. The obligation for the Equipment Purchase was evidenced by two sets of notes, in the respective sums of $18,400 and $18,530 (FLB Exs. 4, 5, 6 & 7; Tr. 87, 88, 91–95). A major difference in the two sets of notes is that the obligation evidenced by Exhibits 4 and 5 was to be repaid on or before December 8, 1986, and the obligation evidenced by Exhibits 6 and 7 was to be repaid on or before December 8, 1987 (Tr. 94, 95). However, Donald Zurface, Jr. could not remember why the notes were drafted in this manner or how the

maturity dates were determined (Tr. 84, 85, 94, 95). The primary reason for setting the maturity dates in this manner was to ensure that H–D had sufficient cash after the fall harvest to make the payments called for by these notes on or before the stated maturity dates (Tr. 104–05; Tr. 304).

20. The obligation for the Livestock Purchase was evidenced by two sets of notes, in the respective sums of $15,861 and $8,700 (FLB Exs. 8–11, Tr. 96). The first obligation, concerning the feeder livestock, had a maturity date of October 8, 1986. The second obligation, for the breeding livestock, had a maturity date of October 8, 1987 (Tr. 96, 97).

21. H–D authorized the granting of a security interest in the Equipment and Livestock by H–D in favor of Donald Zurface, Sr. and Donald Zurface, Jr. pursuant to corporate minutes dated April 8, 1986 (FLB Ex. 3). Security agreements were prepared and executed (FLB Exs. 20–23, and Tr. 116). UCC financing statements were never prepared or filed with the appropriate governmental authorities (FLB Exs. 35–37; Tr. 118–19). Donald Zurface, Jr. believed that the purpose of a security interest in the Equipment and Livestock was to protect himself and his father in the event that H–D failed to make the payments required under the terms of the various notes (Tr. 119–123). Donald Zurface, Jr. could not recall specific discussions with his attorneys about the security agreement or its effects, but believes he questioned someone about them. Donald Zurface, Jr. indicated that if he had discussed the implications of the security agreement with anybody, it would have been with his attorney (Tr. 767–68).

22. Debtors did not transfer any of their real property to H–D. Instead, they executed a lease with H–D whereunder an annual rental payment of $29,740 was to be made by H–D. The obligation for the first year's rent was evidenced by a promissory note (FLB Ex. 18; Tr. 111–113). The lease had a two-year term and was to "continue in effect from year to year thereafter until written notice of termination is given by either party to the other at least 3 months before expiration of this lease or any renewal." Donald Zurface, Jr. does not believe that formal or informal notice of termination was ever given by either party (Tr. 786).

23. On April 25, 1986, as part of the ongoing negotiations between the Zurfaces and FLB, Donald Zurface, Jr. offered to pay $20,200 to FLB, over 24 months, representing his opinion as to the equity in the Livestock. By that time, and unbeknownst to FLB, the Livestock had already been transferred to H–D (Defendant's Exhibit CC; Tr. 757–58). FLB made a counter-offer of approximately $40,000.

24. From April 1986 through June 1986, Debtors were represented by attorneys identified only as Mr. Bains and Mr. Rainsberger of Mt. Sterling, Ohio (Tr. 46, 686–87, 695, 767–68). On or about June 3, 1986, the Debtors retained Charles W. Ewing as their attorney (Tr. 188–89). Ewing has represented the Zurfaces continuously from June 3 to the present and serves as Debtors' Chapter 12 counsel.

25. On June 20, 1986, the Zurfaces transferred the sum of $21,000 in cash to H–D as operating funds (Tr. 109–10, 117). H–D executed a promissory note to Donald Zurface, Jr. and Marguerite Zurface, payable "within 10 years," at 9% interest, but with no other specified repayment terms (FLB Ex. 17, Tr. 106–07).

26. Over the period commencing on April 8, 1986, through the date of filing of the bankruptcy petitions, H–D made a series of cash payments to the Zurfaces. All obligations evidenced by the notes and by the lease have been paid in full through these cash transactions (Tr. 97, 101, 110, 113, 114; FLB Exs. 31, 32). During such period the Zurfaces received the sum of $141,971 from H–D, as described below in detail, in purported satisfaction of the obligations evidenced by the notes and lease. The total of all the obligations is summarized as follows:

| Transfer | Amount |
| --- | --- |
| Equipment | $ 18,400.00 |
| Equipment | $ 18,530.00 |
| Livestock | $ 15,861.00 |
| Livestock | $ 8,700.00 |
| Cash | $ 21,000.00 |

| Transfer | Amount |
|---|---|
| 1986 Lease | $ 29,740.00 |
| 1987 Lease | $ 29,740.00 |
| Total | $141,971.00 |

27. After completion of the payments to Debtors, none of the notes was ever cancelled or destroyed (Tr. 104). H–D was substantially late in making rental payments under the lease for 1986, but was unaware of its delinquency because of the unclear payment schedule (Tr. 115–16). The 1986 rent payments, which were due on December 15, 1986, did not commence until February, 1987, and were paid through June 9, 1987. In contrast, the 1987 rent payments, which would have been due on December 15, 1987, commenced in late August, 1987, and actually were paid down to the balance due of approximately $2,600 as of December 15, 1987 (FLB Ex. 32).

28. FLB representatives performed four searches of Fayette County courthouse records with respect to the Debtors. The searches occurred on November 26, 1985; May 15, 1986; and June 23, 1986; and April 27, 1988; and were conducted to determine the existence of any unusual transfers of property or security interests with respect to the Zurfaces (Tr. 399). No unusual transactions were discovered because the types of transfers undertaken by the Debtors did not require notation in the public record in order to be effective (Tr. 399, 400). Richard Poe, the FLB representative assigned to the Zurface account for most of the time period prior to the bankruptcy filing, did not learn about the existence of H–D, or of the transfer of the Equipment and Livestock from the Debtors to H–D, until well after the filing of the bankruptcy cases (Tr. 399–401). Paul Lensman, the FLB representative assigned to the Zurface account during the pendency of the bankruptcy cases, discovered the existence of H–D and of the transfer of Debtors' assets to H–D only after reviewing the Zurfaces' bankruptcy schedules. Further investigation led to the discovery of an insurance notification which apparently was mailed by the insurance carrier in November or December, 1987, and received by the FLB office some time there-

after (Tr. 654–657). The insurance notification form listed the insured party as H–D. However, that name was not familiar to FLB personnel. H–D's relationship to the Zurfaces was uncovered by an FLB employee who recognized the address of H–D as being the address of one of the Zurface families. Donald Zurface, Jr. acknowledged that he never informed any FLB personnel of the existence of H–D or of the transfer of Zurface assets to H–D (Tr. 401, 725).

29. None of the Debtors received any compensation for their services to H–D, from the time it was organized through the date of the filing of the bankruptcy petitions (Tr. 40, 69, 246, 252; FLB Exs. 14, 25, 30, 39, 40, 41, 43, 44 & 55). Yet, Donald Zurface, Jr. considered H–D to be an important "source of income" for the Zurfaces (Tr. 69). The Zurfaces, and more specifically Donald Zurface, Jr., maintained total control over the affairs of H–D as well as the relationship between the Zurfaces and H–D. Donald Zurface, Jr.'s testimony (Tr. 769–70) illustrates his recognition that he dominated and controlled H–D. Significantly, all testimony of any substance concerning the affairs of H–D, both operational and financial, came only from Donald Zurface, Jr; Rood was unable to provide any meaningful or significant information about the business affairs of H–D. Donald Zurface, Jr.'s dominance of the corporate affairs of H–D from the date of H–D's incorporation until the present time was established by the record.

30. From July 16, 1985, through the present time, Debtors have made no payments on their obligations to FLB or FmHA. Both of these debts were secured by a mortgage against Debtors' real property.

31. Neither Debtors nor H–D maintained any contemporaneous records showing the application of note payments from H–D to Debtors. Following the filing of the bankruptcy petitions, Mr. John Bowen, an accountant for Debtors and H–D, prepared hand-written schedules showing the application of payments made by H–D to Debtors with respect to the various promis-

sory notes made payable to the Debtors and/or Donald Zurface, Sr. and Donald Zurface, Jr. (FLB Exs. 29, 31 & 32; Tr. 98, 99; 254, 257). Debtors provided Mr. Bowen with the order in which payments were to be applied to the various obligations, and based upon such direction Mr. Bowen prepared two schedules marked as FLB Exhibits 31 and 32 (Tr. 258, 263–64). Such schedules reflect an application of payments first to interest-bearing obligations and secondly to non-interest bearing obligations (Tr. 263–265). Mr. Bowen was not fully informed of the facts concerning the transfers from Debtors to H–D or of the existence of the trust until after the filing of the bankruptcy proceedings, resulting in the necessity to amend Debtors' and H–D's 1986 tax returns (Tr. 227–232, 269–270; FLB Exs. 14, 25, 30, 39, 40 & 41.

32. Donald Zurface, Jr., had not seen FLB Exhibits 31 and 32—the schedules listing H–D's payments to Donald Zurface, Jr. and his father—until his deposition was taken on August 1, 1988 (Tr. 98, 99). He was unable to provide information regarding the application of H–D's payments to him or to his father at his first deposition taken on March 30, 1988 (Tr. 102).

33. Mr. Bowen testified that he had not seen the promissory note in the principal amount of $21,000 (FLB Ex. 17) until he was presented with a copy during his testimony at the confirmation hearing (Tr. 259, 260). According to Mr. Bowen the $21,000 note was an interest-bearing obligation and, therefore, was improperly contained in the list of non-interest bearing obligations which he prepared (Tr. 260, 261; FLB Ex. 32). As a result, Exhibit 32 was incorrect, and the amount due to Debtors from H–D on December 31, 1987, was higher than the stated amount of $32.78 (Tr. 266). Donald Zurface, Jr. testified that inclusion of this note on Exhibit 32 was a mistake which he did not notice until he was cross-examined at the hearing on confirmation (Tr. 111). Because of the failure to include this obligation in the list of interest-bearing obligations (FLB Ex. 31), Debtors' and H–D's tax returns will again require amendment in order to reflect the correct tax treatment of the various payments (Tr. 266).

34. The Equipment and Livestock could have been transferred to H–D as a tax-free exchange under 26 U.S.C. § 351 of the Internal Revenue Code (Tr. 227–29; 267–69). In order to qualify for such a tax-free exchange, Debtors would have had to retain at least fifty percent (50%) control over H–D (Tr. 267–69).

35. Debtors' failure to report the transfer of the Equipment and Livestock to H–D in a proper manner resulted in H–D paying increased taxes upon amendment of the 1986 income tax return. Debtors also incurred an additional tax liability for the 1986 tax year and lost a net operating loss carry-forward (Tr. 232, 248–251, 253).

36. One of the reasons for the formation of H–D was that the Debtors had been "feuding" with FLB prior to the transfer (Tr. 76–79). The Debtors were interested in protecting their assets so that H–D could operate without interference from creditors, including, of course, FLB (Tr. 70).

37. Debtors did not believe nor were they advised that there were any tax benefits associated with forming H–D. The only possible tax benefit perceived by Debtors was a saving of self-employment taxes (Tr. 72, 74–75). Donald Zurface, Jr. did not understand that the total F.I.C.A. taxes due, once H–D was incorporated, would have exceeded the self-employment tax assessed an individual (Tr. 75). Thus, there was no F.I.C.A. or self-employment tax benefit in incorporating H–D.

38. H–D was not incorporated for estate-planning reasons (Tr. 73). Donald Zurface, Jr. provided no testimony with respect to any estate-planning benefits or motivations in forming H–D.

39. There were no crops grown nor livestock raised by either of the Zurface families in 1987 (FLB Ex. 27; Tr. 172, 173). All of the farming in 1987 was accomplished by H–D.

40. The Debtors did not attach IRS Schedule F to their 1987 income tax returns. Schedule F is designed to reflect farm income and expenses (Tr. 147; Exs. 43 & 44).

41. Between April 6, 1986, and the present, Debtors have failed to pay the real estate taxes due and owing against the real property upon which FLB holds a mortgage. There is presently due as and for delinquent real estate taxes the approximate sum of $10,000.

42. The value of H–D as of December 31, 1987, approximated $172,864.06, which includes the monies on deposit in an account at Huntington National Bank and in Ewing's law firm trust account. It further includes the value of the Equipment and Livestock, as well as the amounts due H–D from Rood and Brian Zurface, Donald Zurface, Jr.'s brother.

43. As of December 31, 1987, Brian Zurface owed H–D the sum of $9,300 pursuant to two notes executed by him in favor of H–D (Tr. 156–58, 162–63). Also, Rood owed H–D the sum of $2,409 pursuant to a note executed by her in favor of H–D (Tr. 158–62). Various "loans" made by H–D to Zurface family members appear to be gifts; to the extent they were loans they were not made at arm's length and no effort was made to document them properly or to ensure their legal enforceability.

44. The parties have stipulated that during the pendency of any plans confirmed by this Court payment of the FLB debt shall carry interest at a rate of 11.15% per annum.

45. The Chapter 12 plan proposed by Donald and Mildred Zurface, Sr. was filed on March 30, 1988. A separate, but similar, Chapter 12 plan was filed by Donald and Marguerite Zurface, Jr. on the same date.

46. Donald and Mildred Zurface, Sr. propose to fund their plan, in part, through income derived from Mrs. Zurface, Sr.'s off-farm income. At the time of the hearing on confirmation of her plan, Mrs. Zurface, Sr. was not employed and it was not known when, or if, she would be able to secure employment. The Court finds that the monies attributable to Mrs. Zurface, Sr.'s off-farm income are too speculative to use in calculating the feasibility of her plan (Tr. 198–99).

47. Donald and Marguerite Zurface, Jr. propose to fund their plan, in part, through income derived from Mrs. Zurface, Jr.'s substitute teaching. At the time of the hearing on confirmation of the plan, she had not commenced teaching on a substitute basis nor was there any offer of such employment (Tr. 199, 206). Accordingly, there was no foundation to support a determination regarding the amount of income Mrs. Zurface, Jr. would likely receive from substitute teaching.

48. The budgets proposed by Debtors do not include a monthly set-aside of money so that sufficient funds will be available on an annual basis to pay FLB in accordance with the terms of the plans.

49. The budgets do not provide for payment of Debtors' federal, state or local income taxes.

50. As of December 31, 1987, H–D had few outstanding obligations. Although not totally clear, such obligations were between $5,000 and $10,000 (Tr. 163–69).

51. All fees, charges or amounts required under chapter 123 of title 28 have been paid.

52. Postpetition books of account and a checking account have been opened by Debtors.

53. Rood's husband became ill with congestive heart failure (Tr. 323) and he, therefore, has been unable to assist in H–D's farming operations as he originally intended.

54. The Debtors' plans propose to pay a three percent (3%) dividend to holders of allowed unsecured claims. FLB holds secured and unsecured claims.

### Discussion

Confirmation of Debtors' Chapter 12 plans has been sharply contested by FLB and Pees. The hearing on confirmation consumed a week of the Court's calendar and was concluded by closing arguments lasting a full day. The record is extensive and includes voluminous documentary evidence. Realizing that "justice delayed is justice denied," the Court's opinion treats the numerous legal arguments advanced by

the parties as extensively as permitted in light of a very busy docket.

Preliminarily speaking, the record leads this Court to the inescapable conclusion that the Debtors have not proposed their plans in good faith. Moreover, they have plainly fallen far short of the mark in satisfying the other criteria imposed by the Code for confirmation of a Chapter 12 plan. It is even doubtful that they are family farmers as that term is defined in the Bankruptcy Code. Most importantly, perhaps, is the Court's conclusion that the Debtors' actions with respect to their creditors, from April 7, 1988—when H–D was formed—to the present, were intended to hinder, delay and defraud those creditors. There was no legitimate business purpose for forming H–D; it was formed, quite obviously, as the principal component of an overall scheme to place assets out of the reach of FLB and other creditors. Although the testimony of Donald Zurface, Jr. and Rood was offered in support of confirmation, it was utterly lacking in credibility and supported the allegations made by Pees and FLB.

### The Good Faith Standard

A bankruptcy court shall confirm a Chapter 12 plan if the plan has been proposed in good faith or not by any means forbidden by law. *See,* 11 U.S.C. § 1225(a)(3); *In re Euerle Farms, Inc.,* 861 F.2d 1089 (8th Cir.1988). Chapter 12 is emergency legislation enacted by Congress to deal with a crisis in family farming and, in many respects, is modeled after Chapter 13. *Matter of Culbreth,* 87 B.R. 225, 227 (Bankr.M. D.Ga.1988). The requirements for confirmation of a Chapter 12 plan set forth in 11 U.S.C. § 1225 are substantially the same as those applicable to Chapter 13 plans (See, 11 U.S.C. § 1325), and analogy may be made to Chapter 13 precedents in interpreting § 1225. *See,* 5 *Collier on Bankruptcy* ¶ 1225.01 (15th ed. 1987), *In re Janssen Charolais Ranch, Inc.,* 73 B.R. 125 (Bankr. D.Mont.1987); *In re Willingham,* 83 B.R. 552, 17 B.C.D. 432 (Bankr.S.D.Ill.1988).

The Sixth Circuit, noting that good faith is an amorphous notion largely defined by factual inquiry, has held that the bankruptcy court must ultimately determine whether the debtor's plan, given his or her individual circumstances, satisfies the purposes undergirding Chapter 13; that is, whether it is a sincerely-intended repayment of pre-petition debt consistent with the debtor's available resources. *Metro Employees Credit Union v. Okoreeh–Baah (In re Okoreeh–Baah),* 836 F.2d 1030, 1033 (6th Cir.1988). The decision should be left simply to the bankruptcy court's common sense and judgment. *Id.* Because a determination of good faith is not susceptible to a mechanical equation, there are specific factors which the court may find meaningful and assistive in making its determination. The Sixth Circuit set forth the following nonexhaustive list of factors:

(1) the amount of the proposed payments and the amount of the debtor's surplus;

(2) the debtor's employment history, ability to earn and likelihood of future increases in income;

(3) the probable or expected duration of the plan;

(4) the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court;

(5) the extent of preferential treatment between classes of creditors;

(6) the extent to which secured claims are modified;

(7) the type of debt sought to be discharged and whether any such debt is nondischargeable in Chapter 7;

(8) the existence of special circumstances such as inordinate medical expenses;

(9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act;

(10) the motivation and sincerity of the debtor in seeking Chapter 13 relief;

(11) the burden which the plan's administration would place upon the trustee; and,

(12) whether the debtor is attempting "to abuse the spirit of the Bankruptcy Code," is a legitimate factor to consider, . . . .

*Hardin v. Caldwell (In re Caldwell),* 851 F.2d 852, 859 (6th Cir.1988) (quoting with approval from *In re Estus,* 695 F.2d 311, 317 (8th Cir.1982)).

■■■■ The test established by the Sixth Circuit calls for a broad judicial inquiry into the conduct and state of mind of the debtor with respect to the proposal of a plan. Such inquiry properly enters into all aspects of fair dealing relevant to the plan, including the lawfulness of the debtor's conduct and his good faith in dealing with creditors and their claims. *See, Matter of Yavarkovsky,* 23 B.R. 756, 759 (S.D.N.Y. 1982). In the instant case, the Debtors' plans do not satisfy the good faith criterion. The record clearly demonstrates the perpetration of a fraud, beginning no later than April 7, 1986, and continuing to the present with respect to the claims of FLB and the general creditor body.

The facts show that in late 1985 or early 1986 the Debtors, apparently with the assistance of counsel, hatched a plot to thwart FLB from foreclosing upon their property. In March and April 1986, when it became apparent to the Debtors that their Note and other obligations to FLB could not be restructured to their satisfaction and that FLB was poised to take necessary legal action to reduce its claim to judgment, the Debtors decided to place their assets beyond the reach of FLB and their other creditors. On April 7, 1986, the Debtors, while continuing negotiations with FLB regarding a possible restructuring of their debt, formed H–D and transferred all of their valuable assets to that corporation. They made no effort to advise FLB of H–D's incorporation or the transfer of their Assets; to the contrary, they continued their discussions with FLB without the slightest hint that the subject transfer had been effected. They made no mention to FLB of the extraordinary transactions between H–D and themselves at a time when such transactions were obviously of critical importance to the claims of FLB and other creditors.

The Equipment Purchase and Hog Purchase were made for inadequate consideration: the value paid by H–D was significantly below the property's fair market value. Debtors advanced some supposed business, tax and family planning reasons for incorporating H–D and transferring all their assets to H–D; however, the pathetic parade of justifications offered strain credulity and defy common sense. It is not surprising, then, that even the Debtors were unable to articulate any legitimate basis for forming H–D. Their constant, plaintive looks to their counsel for some assistance in trying to attach some sound business reason for incorporating H–D did not escape the Court's detection.

Simply put, there were no federal, state or local tax benefits planned or obtained from forming H–D. Likewise, the claimed estate-planning benefits were nonexistent and may really result in additional liabilities. Further, the formation of H–D offered no appreciable protection from personal liability for Rood or her husband. In sum, H–D was created for the sole purpose of placing assets beyond the reach of FLB and with the intent of hindering, delaying and defrauding FLB and other creditors.

The totality of the circumstances involved in the formation of H–D and proposal of Debtors' plans further evidences their bad faith. Debtors continued to negotiate with FLB in April 1986 and thereafter regarding their liability to FLB and possible liquidation of their Equipment and Livestock while contemporaneously divesting themselves of as much of their property as possible without calling attention to their scheme. They wisely avoided perfecting security interests in the Equipment and Livestock or of transferring real property because a review of the county's public records would have exposed their plot. After transferring most of their property to H–D, the Debtors, through H–D, "paid" themselves and other family in excess of $150,000 in cash, loans and gifts. Many of the liquid assets transferred from H–D to Debtors and other Zurface family members

have been dissipated and cannot be accounted for.

Having examined the record in light of the factors outlined in *Caldwell,* and after observing the conduct and demeanor of the Debtors and Rood, the Court is absolutely convinced that the Debtors' plans represent an attempted abuse of the spirit of the Code. The Court further concludes that Debtors lack the honesty of intention which is an essential prerequisite to obtaining relief in this Court. *See, In re Johnson,* 708 F.2d 865 (2d Cir.1983). Further, Debtors' pre-filing conduct was plainly dishonest. *See, Yavarkovsky, supra* (finding bad faith where debtor's transfer of his only substantial asset to a family member was a contrivance designed to convert his assets into an unreachable form to the prejudice of his creditors). Accordingly, the Debtors' plans are not proposed in good faith and cannot be confirmed by this Court.

█ The Court finds further that the Debtors' transfer of their assets to H–D in April 1986 constituted a fraudulent conveyance because the transfer was made with an intent to defraud, hinder or delay creditors. *First National Bank of Chicago v. F.C. Trebein Company,* 59 Ohio St. 316, 52 N.E. 834 (1898). Ohio Revised Code § 1336.07 provides that:

> Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors, is fraudulent as to both present or future creditors.

Debtors' fraudulent transfer of their assets to H–D is an additional ground for denial of confirmation under 11 U.S.C. § 1225(a)(3).

In determining whether a conveyance is made with actual intent to hinder, delay, or defraud a creditor, direct evidence of fraudulent intent is not essential and, indeed, in most circumstances is not likely to be available. Consequently, certain traditionally designated "badges" or indicia of fraud— circumstances which usually or frequently attend a conveyance designed to hinder, delay, or defraud creditors—in concert with other suspicious circumstances, have generally been held to be sufficient to show fraud and invalidate the transfer of property. *Toledo Trust Company v. Poole (In re Poole),* 15 B.R. 422, 431–32 (Bankr. N.D. Ohio 1981). Common badges of fraud include:

(1) litigation pending or anticipated at the time of conveyance;

(2) transfer of all assets of the debtor for inadequate consideration;

(3) failure to record the instrument of conveyance;

(4) sale on credit to an unworthy purchaser or on flimsy credit terms;

(5) parties to the transfer are related by blood or marriage;

(6) reservation of the benefit to the transferor or his family;

(7) transfer of all or a part of property by the transferor by gift where there is no provision for payment of the debts; and

(8) the retention of control and domination of the corporation to which assets are transferred.

*See generally, Hadar Leasing International Co., Inc. v. D.H. Overmyer Telecasting Co., Inc. (In re D.H. Overmyer Telecasting Co., Inc.),* 23 B.R. 823 (Bankr. N.D. Ohio 1982) (a common badge of fraud is retention of possession by a debtor after he purports to transfer it). When a transfer has been made to a close family member, suspicion of inadequacy of consideration is heightened. *National Bank of Pittsburg v. Butler (In re Butler),* 38 B.R. 884 (Bankr.D.Kan.1984); *Gilbert v. Maston (Matter of Maston),* 44 B.R. 880 (Bankr. S.D.Ohio 1984); *Tapper v. Herbst (In re Herbst),* 76 B.R. 882 (Bankr.D.Mass.1987); *Cates-Harman v. Reininger–Bone (Matter of Reininger–Bone),* 79 B.R. 53 (Bankr. M.D.Fla.1987); *Hall v. Kuhlman (In re Steele),* 79 B.R. 503 (Bankr. M.D.Fla.1987); *Zoltanski v. Akst (In re Zyndorf),* 80 B.R. 876 (Bankr. N.D.Ohio 1987).

In the instant case, a sufficient, if not overwhelming, number of these badges of fraud exist. The Debtors never relinquished possession of the transferred property; to the contrary, they continued to use

the same real and personal property to conduct their farming operation. Thus, while ownership of most of their property has been transferred to H–D, Debtors have remained in constant possession of that property and have controlled its use. Likewise, Donald Zurface, Jr. dominated and controlled the affairs of H–D, both before and after conveyance of the property was made to H–D.

The purported formation of H–D for the benefit of the minor children of Donald Zurface, Jr. was a ruse. Rood, the trustee of a claimed oral trust, had virtually no involvement in or knowledge of the management of H–D. Her testimony exhibited surprisingly little knowledge of H–D's operations other than to affirm that Donald Zurface, Jr. ran the company. The minor children, both of whom are quite young, obviously had no direct involvement in the farm operation. It is obvious that the so-called oral trust and H–D itself were integral pieces in the general scheme to hinder, delay and defraud FLB and other creditors.

Debtors' assets were transferred for less-than-adequate consideration. Clearly, the value of the Equipment Purchase ($36,930) and Hog Purchase ($24,561) did not constitute adequate or fair consideration when compared to the true value of the Equipment ($49,502) and Livestock ($48,110). Similarly, Debtors never requested nor obtained salary or other compensation from H–D during the approximately 20 months of H–D's prepetition existence. Viewing the transaction as a whole, the Court must conclude that it was not at arm's length nor was fair consideration exacted.

Another telling badge of fraud was the Debtors' transfer of their entire estate. All unencumbered assets owned by Debtors were conveyed to H–D at a time when FLB was close to foreclosing upon Debtors' defaulted obligations, repossessing secured collateral, and attaching unsecured collateral to satisfy its claim. The undisclosed, in fact clandestine, formation of H–D under those circumstances is a strong indicator of fraud. *See, Gilbert v. Maston (Matter of Maston), supra; Squire v. Cramer*, 64 Ohio App. 169, 17 Ohio Op. 499, 28 N.E.2d 516 (1940). It is likewise obvious from the record that the Debtors were insolvent when the transfers were made in April, 1986, and that litigation against them was anticipated.

Thus, the record is replete with badges of fraud. The record further supports the Court's finding of an overall fraudulent scheme. The general demeanor and conduct of the Debtors and their witnesses, combined with their actual testimony, further established the existence of a plan, concocted by Debtors with the apparent assistance of their counsel, to defraud FLB and the other creditors. Having heard the testimony and reviewed the evidence—all of which vividly highlights Debtors' fraud —the Court remains surprised that the Debtors actually believed that their fraudulent scheme somehow would withstand the Court's scrutiny.

### The Best-Interest-of-Creditors Test

■ Having found that the Debtors fraudulently transferred their property to H–D, the plans clearly do not satisfy 11 U.S.C. § 1225(a)(4). Pursuant to § 1225(a)(4), the Court may confirm a plan if the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under Chapter 7 on such date. Section 1225(a)(4), known as the "best interest of creditors" test, requires that unsecured creditors receive at least as much under a Chapter 12 plan as they would in a Chapter 7 liquidation. *In re Willingham, supra; In re Hansen*, 77 B.R. 722 (Bankr. N.D.1987); *cf. In re Chapman*, 51 B.R. 663, 668 (Bankr. D.C.1985); *In re Fauth*, 79 B.R. 490 (Bankr.D.Mont.1987). Debtors proposal to pay unsecured claims a 3% dividend does not meet this standard considering the likely recovery of the property fraudulently transferred to H–D. *See, In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 150 (Bankr. S.D.N.Y.1984); *In re Future Ener-*

*gy Corp.,* 83 B.R. 470, 489 n. 3 (Bankr.S.D. Ohio 1988).

### The Feasibility Standard

■ The Court also must determine whether the Debtors will be able to make all payments under and comply with the plan. *See,* 11 U.S.C. § 1225(a)(6). The Court must scrutinize the plan carefully to determine whether it offers a reasonable prospect of success and is workable. *In re Monnier Brothers,* 755 F.2d 1336, 1341 (8th Cir.1985). Even a cursory examination of the record discloses that the Debtors' plan is not feasible.

■ The key to the determination of feasibility relates to "the probability of actual performance of provisions of the Plan." *In re Crowley,* 85 B.R. 76, 78 (D.W.D.Wis. 1988) (quoting *In re Konzak,* 78 B.R. 990 (D.N.D.1987)). More specifically, a plan will be found feasible if "it appears reasonably probable that the farmer can pay the restructured secured debt over a reasonable period of time, at a reasonable rate of interest, in light of farm programs as of the date of confirmation." *Id.* (citations omitted). The burden of proof is on the Debtors. *In re Olp,* 29 B.R. 932, 936 (Bankr. E.D.Wis.1983); *In re Hogue,* 78 B.R. 867, 872 (Bankr.S.D.Ohio 1988).

■ Here, the Debtors have failed to convince the Court that there will be sufficient monies available to make the annual payment of $57,800 proposed to be made to FLB or to pay other creditors. Given the approximately $72,000 which will be available to maintain the two Zurface households and satisfy plan obligations, it is obvious that the Debtors cannot pay FLB, their administrative and general claimants in this case, and maintain sufficient funds with which to live. It is also readily apparent that Debtors possess insufficient funds under any circumstances to make plan payments in the amounts required in 1989. Furthermore, there are no budgeted amounts for the payment of federal, state and local income taxes. Thus Pees' assertion that the plans do not comply with 11 U.S.C. § 1225(a)(6) is well-taken.

### Dismissal/Conversion

■ Having found that the Debtors have committed fraud in connection with their Chapter 12 cases, the Court may dismiss the cases or convert them to cases under Chapter 7 pursuant to 11 U.S.C. § 1208(d). Section 1208(d) provides as follows:

> On request of a party in interest, and after notice and a hearing, the court may dismiss a case under this chapter or convert a case under this chapter to a case under chapter 7 of this title upon a showing that the debtor has committed fraud in connection with the case.

Section 1208(d) is unique—there is no analogous provision dealing with conversion of cases filed under Chapters 7, 11 or 13 of the Code. Further, there appear to be no reported decisions construing § 1208(d). Hence, the legislative history, as sparse as it is, serves as the sole source of interpretative guidance for the Court. It provides:

> If fraud is found, the case will be dismissed or converted to Chapter 7. This encourages good faith, [sic] and honest dealing by the debtor throughout the case. (132 Cong.Rec. S15076 (Oct. 3, 1986).)

The Sixth Circuit's standards are in consonance with the legislative history: relief under Chapter 12 is available only to the honest debtor who is making a sincere effort to repay creditors. Given the Court's finding that the Debtors have engaged in a scheme to defraud their creditors and have continued this scheme through the presentation of exceedingly unbelievable testimony regarding their true motives, conversion certainly appears appropriate.

Conversion to Chapter 7 will permit an appointed trustee to seek return of all assets fraudulently transferred to H–D. *See,* 11 U.S.C. §§ 544, 548. Recovery of those assets will benefit all creditors and the estate. Dismissal of the case would benefit Debtors alone, who would be permitted to further delay payment of their just debts and dissipate, quite possibly, assets which would be available for distribution to creditors. Accordingly, these related cases are hereby converted to cases under Chap-

ter 7. A trustee shall be appointed in each case immediately. In the interest of economy and efficiency, it is presumed that the United States Trustee will appoint the same trustee in each of these two cases. Having ordered these cases converted to cases under Chapter 7 of the Code, it is unnecessary to decide whether Debtors are family farmers as that term is defined in the Code.

Confirmation of Debtors' plans is, therefore, DENIED and these related cases are hereby converted to cases under Chapter 7. The Court further orders that H–D shall file with this Court a written, monthly accounting of its assets and liabilities and that it make no transfers of property out of the ordinary course of business with respect to any property, or proceeds thereof, transferred to it by Debtors absent Court approval.

IT IS SO ORDERED.