**In re Wilfred REINBOLD, Debtor.**

**Bankruptcy No. 87–10311.**

United States Bankruptcy Court, D. South Dakota.

Feb. 5, 1990.

Brent A. Wilbur, Pierre, S.D., for Dewey County Bank, creditor.

Al Arendt, Pierre, S.D., for debtor, Wilfred Reinbold.

## MEMORANDUM DECISION

IRVIN N. HOYT, Chief Judge.

Creditor Dewey County Bank, has brought motions for relief from the automatic stay and to convert debtor Wilfred Reinbold's case from one under Chapter 12 to one under Chapter 7 of the United States Bankruptcy Code. A hearing on the motions was held January 25, 1990. After hearing the testimony of various witnesses, considering the arguments of counsel, and reviewing the evidence and court file, the Court will grant the motions.

This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (G). This memorandum constitutes the Court's findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure and Rule 7052 of the Federal Bankruptcy Rules.

Debtor Wilfred Reinbold (Reinbold) filed a petition under Chapter 12 of the Bankruptcy Code on October 15, 1987. His Chapter 12 plan of reorganization was confirmed on July 22, 1988. Part of Reinbold's plan was his treatment of the debt owed to creditor Dewey County Bank (DCB), which was set forth in a stipulation approved by this Court on July 12, 1988. The stipulation required, among other things, that Reinbold surrender all farm machinery and equipment in which DCB had a first lien or security interest. Such surrender was to occur on or before August 1, 1988. DCB's security agreement, dated January 4, 1985, was acknowledged as valid by the parties to the stipulation. Reinbold did surrender certain items of machinery and equipment as required by the stipulation, but DCB disputed whether they were the same pieces of equipment contemplated in the security agreement.

On August 23, 1988, DCB moved to convert Reinbold's case to one under Chapter 7, claiming that he had concealed certain pieces of machinery subject to the bank's security interest and substituted other, less valuable machinery in their stead and that Reinbold had concealed various other assets that were subject to the DCB security interest, including farm machinery allegedly held by third parties. This matter was postponed indefinitely on the motion of Reinbold and without objection from DCB.

On January 16, 1990, DCB filed a motion for relief from the automatic stay and for a writ of assistance. An ex parte motion for an expedited hearing was also filed and subsequently granted. A hearing on both the motion to convert and the motion for relief from stay was held January 25, 1990, and revealed the following:

1. In 1980, Reinbold purchased a Model 115 Melroe spray coupe.

2. On July 7, 1980, Reinbold purchased a Model 4400 Versatile self-propelled swather.

3. On January 4, 1985, Reinbold gave DCB a security interest in all of his equipment, farm machinery, crops, certain real estate, a truck and two trailers. A stipulation between the parties dated July 5, 1988, and approved by this Court on July 12, 1988, acknowledged the existence of this agreement.

4. Reinbold sold to Donald L. Peterson a Model 115 Melroe spray coupe and a Model 4400 Versatile self-propelled swather, as evidenced by a document signed by them and dated September 15, 1985.

5. A lease back agreement with option to purchase on the spray coupe dated April 20, 1986, was executed by Reinbold and Peterson. Reinbold repurchased the spray coupe on August 14, 1989.

6. Reinbold and Peterson executed a lease back agreement on the swather, which agreement was dated July 1, 1986.

7. On August 2, 1989, the Model 4400 swather and attachments were trad-

ed to Haberer's Implement of Mobridge for a Model 150 Versatile tractor. The purchase agreement, marked as Exhibit 12, shows Reinbold as the sole owner of the swather. Exhibit 13, another purchase agreement covering the same equipment and backdated to August 2, 1989, shows Reinbold and Peterson as co-owners of the swather.

Under the terms of the stipulation with DCB, Reinbold surrendered certain pieces of farm equipment to the bank. Law enforcement authorities were contacted after Reinbold turned over pieces of machinery other than the bank had anticipated. These included a pull-type swather and a Model 103 Melroe spray coupe. An investigation by the South Dakota Division of Criminal Investigation uncovered that the serial plate was missing on the Model 103 spray coupe turned over to the bank and that Reinbold had a Model 115 spray coupe in his possession. Interestingly, the DCI found a serial plate for a Model 103 spray coupe on the Model 115, adjacent to where the Model 115's serial plate should have been. The Model 103 serial plate was attached to the Model 115 with mud.

The DCI also constructed the paper trail that showed the transactions between Reinbold and Peterson as well as the purchases and eventual sales of the swather, the Model 103 spray coupe and the Model 115 spray coupe.

At the hearing, counsel for DCB explained that the series of events surrounding the spray coupe, swather and a Model 900 Versatile tractor would be used as examples of the fraud that they claimed permeated this bankruptcy. Finding sufficient the episodes involving the spray coupe and swather, the Court will not address the incident concerning the tractor.

11 U.S.C. § 1208(d) provides:

On request of a party in interest, and after notice and a hearing, the court may dismiss a case under this chapter or con-

vert a case under this chapter to a case under chapter 7 of this title upon a showing that the debtor has committed fraud in connection with the case.

11 U.S.C. § 362(d) provides:

On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest[.]

■ The Court first finds that Reinbold's "sales" of the spray coupe and swather to Peterson would themselves be sufficient to warrant conversion of this case to one under Chapter 7. The terms of Reinbold's security agreement with DCB made it abundantly clear that *all* of Reinbold's farm machinery and equipment was encumbered to the bank. Regardless, Reinbold "sold" these implements to Peterson in order to satisfy debts owed by Reinbold to Peterson.[1] Reinbold neither solicited nor received DCB's permission to transfer property in which it had a security interest. Further, DCB received no funds from Reinbold with reference to these transactions.

Reinbold's transfer of the spray coupe and swather to Peterson (both of which occurred on the same date) with knowledge that they were encumbered and without any consideration for DCB's interest is further mired in fraud when one examines the lease back arrangement between Reinbold and Peterson. The spray coupe lease provided that Reinbold may use the spray coupe, "with the understanding that he will also spray Peterson Farms crops for the use of the spray coupe." The lease also provided that Reinbold had the option to purchase the spray coupe "at the going rate." The swather lease provided that Reinbold may use the swather "with the agreement that Peterson Farms combines Reinbold Grain Farms crops for $12.00 per

---

1. The Model 115 spray coupe was "sold" to Peterson for $5,000.00. This was in return for a debt owed to Peterson for combining 500 acres of Reinbold's wheat at $10.00 per acre. The Model 4400 swather was "sold" to Peterson in return for Peterson combining 481 acres of Reinbold's wheat at $12.00 per acre.

acred [sic.]." The Court finds both of these leases to be of questionable validity due to the consideration provided in each. The most glaring example of the illusory nature of the leases may be found in the swather lease. That lease granted Reinbold permission to use the swather; in return Peterson would be paid $12.00 an acre for combining Reinbold's crops. However, the lease makes no provision for payment if there are no crops to combine and testimony was adduced at the hearing which showed that Reinbold had control over the number of acres that Peterson could harvest. Reinbold was able to exercise such control because he would combine much of his wheat crop before Peterson, a custom harvester, would return to northern South Dakota. When Peterson did arrive, Reinbold would still operate his two combines while Peterson operated only one, thus further reducing or completely eliminating the number of acres for Peterson to combine. Coupling Reinbold's control of the number of acres to be combined by Peterson with the ever-present risk of a low yield or crop failure, Peterson could be left with no harvesting income from Reinbold's crops. In fact, Peterson's and Reinbold's testimony at the hearing revealed that one year did pass where Peterson did not combine any of Reinbold's crops.

The Court also notes several other concerns, the first being the removal and replacement of the serial plates on the swather and spray coupe. This concern is intensified considering the 115 spray coupe found by the DCI at Reinbold's had a serial plate attached to it for an older, less valuable Model 103. The Court is also concerned that Reinbold showed a spray coupe valued at $10,000.00 on his financial statements to DCB but turned over to DCB an older model with a value of $2,000.00. Likewise, Reinbold showed a swather valued at $5,000.00 on his financial statements to DCB, yet turned over to the bank an old pull-type swather in extremely poor and possibly inoperable condition.

Another matter that the Court finds disturbing is that the sale of both the spray coupe and the swather appear to have occurred on the same day (September 15, 1985) while the lease back agreements for those implements appear to have been executed on different dates (April 20, 1986 for the spray coupe; July 1, 1986 for the swather). The use of these different dates, while perhaps innocuous in and of themselves, was cast in a shadow of suspicion by DCI Agent Lake, who testified that despite the differing dates, all of the documents appear to have been signed by Reinbold and Peterson with the same pen. Given the span of time between the dates on the various documents, the Court has trouble dismissing Agent Lake's observation as a mere coincidence.

Finally, the Court takes note of the convenient timing of Reinbold's repurchase of the Model 115 spray coupe. As noted earlier, Reinbold sold the spray coupe to Peterson on September 15, 1985 and later received an option to repurchase the sprayer. Reinbold exercised that option on August 14, 1989, more than a year *after* he was to have surrendered all of his machinery to the bank pursuant to the July 1988 stipulation between Reinbold and DCB. The Court does not believe that the repurchase of the spray coupe after the proposed turn over date was simply happenstance.

Chapter 12 reorganization was designed to give family farmers facing bankruptcy a fighting chance to reorganize their debts and keep their land. H.R.Conf.Rep. No. 958, 99th Cong., 2d Sess., 132 Cong.Rec. H 8998, H 8999 (Oct. 2, 1986), U.S.Code Cong. & Admin.News 1986, 5227. Section 1208 is designed to encourage *good faith and honest dealing* by the debtor throughout his Chapter 12 case. If fraud is found, the case will be dismissed or converted to Chapter 7. 132 Cong.Rec. S15,076 (daily ed. Oct. 3, 1986) (statement of Senator Grassley) (emphasis added). In this case, the Court finds that debtor Wilfred Reinbold committed fraud in two instances. He first transferred to Donald Peterson a swather and spray coupe secured to DCB without the knowledge or consent of the bank. Second, he surrendered to the bank other, older and less valuable machinery as a substitute for that property transferred to Peterson. Namely, Reinbold attempted

to substitute a Model 103 Melroe spray coupe for a Model 115 spray coupe and an old worn, pull-type swather for a Model 4400 Versatile self-propelled swather.

■ Reinbold's actions warrant the conversion of this case to Chapter 7. While conversion to a Chapter 7 liquidation is admittedly a harsh result, it is nevertheless appropriate in this case, where Reinbold's actions so clearly evidenced fraud. *See In re Caldwell,* 101 B.R. 728 (Bankr.D.Utah 1989), *In re Graven,* 101 B.R. 109 (Bankr. W.D.Mo.1989), and *In re Zurface,* 95 B.R. 527 (Bankr.S.D.Ohio 1989). As noted by Judge Koger in *Graven,* bankruptcy laws "have always had as their intent the protection and/or rehabilitation of honest debtors. They are not and have not been intended to shield those parties who have attempted to hinder, delay or defraud their creditors." *Id.* at 112. Here, the debtors have not acted in an honest and forthright manner and the spirit of Chapter 12 would be dampened if Reinbold was allowed to reorganize under Chapter 12 without atoning for his transgressions.

Further, conversion, and not dismissal, is the proper action for this Court to take in response to fraudulent activity. Judge Koger, analogizing to cases converted under Chapter 13, noted in *Graven* that honest debtors who choose to dismiss their cases are usually permitted to do so while debtors who have sought to use the bankruptcy court as a "subterfuge rather than a refuge" usually will be faced with a conversion. *Id.* at 113. This sentiment was also expressed in *Zurface, supra,* wherein Judge Cole noted that "relief under Chapter 12 is available only to the honest debtor who is making a sincere effort to repay creditors." 95 B.R. 527, 539. Further, the Court in *Zurface* noted that "dismissal of the case would benefit Debtors alone, who would be permitted to further delay payment of their just debts and dissipate, quite possibly, assets which would be available for distribution to creditors." *Id.*

The decision to convert Reinbold's case to a Chapter 7 would also benefit other creditors who, unlike DCB, have not prosecuted or do not have the resources to prosecute an action for fraud or a motion for relief from the automatic stay. The conversion of this case to one under Chapter 7 has the practical effect of foregoing the necessity of rediscovering the same fraudulent activity discussed above with reference to other creditors. Conversion to Chapter 7 will permit the Chapter 7 trustee to seek the return of all assets that may have been fraudulently transferred. *See* 11 U.S.C. §§ 544, 548; *See also Zurface, supra* at 539.

■ Realizing that justice delayed is justice denied, the Court will grant DCB's motion for relief from the automatic stay in order to expedite the recovery of its collateral. DCB's motion to convert Reinbold's case to one under Chapter 7 will also be granted. The Court will enter an order to that effect. DCB's request for terms under Rule 9011 will be denied. DCB's request for a restraining order relative to the debtor's collateral will be denied, as such would be more properly considered by the state court. DCB's request for the issuance of writ of assistance will be considered when application for such a writ is made.